[No. 3147.]

## Anderson N. Johnson v. The State.

1. Theft—Indictment.—Under the statute in force prior to the adoption of the Revised Codes, the theft of a gelding was a specific offense. The word "horse" was not used in that statute in its comprehensive and generic sense, and did not include a "gelding," "mare" or "colt." Indictment for the theft of a gelding, presented before the adoption of the Revised Codes, properly described a stolen animal as a "gelding."

2. Same—Practice—Repealed Laws —The effect of Article 726 of the Revised Penal Code was to include in the generic term "horse" all animals of the horse kind, as distinguished from ass or mule, and to the extent of destroying all legal distinctions between the animals embraced, it operates to repeal the statute previously in force. The Final Title to the Revised Statutes, by express provision, prescribed for pending cases, both civil and criminal, the following rule: "No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred prior to the time when any statute, or part thereof, shall be repealed or altered by the Revised Statutes, shall be discharged or affected by such repeal or alteration; but prosecutions and suits for such offenses, liabilities, penalties or forfeitures, shall be instituted and proceeded with in all respects as if such prior statute or part thereof had not been repealed or altered except that where the mode of procedure or matters of practice have been changed by the Revised Statutes, the procedure had after the Revised Statutes shall have taken effect in such prosecution or suit shall be as far as practicable, in accordance with the Revised Statutes." Under

this rule it was necessary in this case that the proof should have supported the allegation that the animal stolen was a "gelding," because the theft was committed before the revision of the Codes, and the indictment described the animal as a gelding.

3. SAME—EX POST FACTO LAW.—To apply the new provision (Article 746 of the Revised Penal Code) in a trial for horse theft committed before the Revised Codes took effect would be *ex post facto*, and it has been properly *held* that a variance between the allegation and the proof is fatal to the conviction, notwithstanding the trial was held since the Revised Statutes took effect.

4. SAME—FACT CASE.—See the statement of the case for evidence *held* insufficient to support a conviction for theft of a gelding, inasmuch as it fails to establish the identity of the defendant as the thief, beyond a reasonable doubt.

APPEAL from the District Court of Houston.  Tried below before the Hon. J. R. Kennard.

The indictment in this case was filed in the district court of Houston county on the twenty-fifth day of November, 1876.  It charged that the appellant, on the twenty-first day of August, 1876, did steal a certain gelding, the property of one Amanda Brown.  The trial was had at the March term, 1884, of the district court, when the appellant was convicted, and his punishment was assessed at a term of five years in the penitentiary.

Mrs. Amanda Walker was the first witness for the State.  She testified that her name in August, 1876, was Amanda Brown. She was well acquainted with the defendant, and pointed him out in court.  The witness first saw the defendant in the early part of the year 1876, when he came to witness's house, and contracted with her then husband, Mr. Brown, to make a crop on the place.  The defendant remained at the house of the witness and Brown until some time in July, 1876, when he left and went to Mrs. Bruce's to live, having previously sold his crop. Since some time in 1876, until his trial, the witness has not seen the defendant.  The defendant was fleshier at the time of his trial than he was in 1876, and wears a somewhat heavier beard. In 1876 the defendant passed under the name of Jim Johnson.

On the night of the twenty-first day of August, 1876, the witness lost a cream colored horse, in Houston county, Texas.  The defendant was at the house of the witness and Brown on that night about nine o'clock.  He passed through the room in which the witness was sitting at the time, but said nothing to the witness.  The witness's horse at that time was staked out in the

field. She saw the horse in question late on that evening, and missed him about sunrise, or a little later, the next morning. The witness's former husband, Mr. Brown, died in July, 1876, and the horse was the property of his estate, and was not the separate property of the witness. The witness administered on the estate of her deceased husband, but did not now remember when she qualified as administratrix—whether before or after the theft of the horse. She had the absolute control and possession of the horse, and he was taken from that control and possession without the knowledge or consent of the witness. Mrs. Bruce, the lady previously spoken of, lived a short distance from the house of the witness, and the defendant lived at Mrs. Bruce's from the time he left the witness's house in July, 1876, until the horse was missed. At the same time that the horse disappeared the defendant disappeared. His saddle and his saddle bags disappeared at the same time. He had no horse. The defendant was married to Mrs. Bruce's daughter, and lived at Mrs. Bruce's house after his marriage until he disappeared.

On cross-examination by the defense, the witness stated that she did not see the defendant take her horse, and never saw him in possession of the horse after the animal disappeared. On the same night that the defendant stole witness's horse, a man named Parker stole the defendant's wife.

Robert Hale was the second witness introduced and sworn by the State. He testified that he lived in Houston county, Texas, near the residence of Mrs. Amanda Walker, formerly Mrs. Amanda Brown. He knew the defendant, and he knew the horse that the defendant is charged to have stolen from Mrs. Brown. At this point the witness was directed by counsel for the State to point the defendant out in court. He pointed out a man who sat some three or four feet from the defendant. He was again directed to point out the defendant, and he again pointed out the man who sat some three or four feet distant from the defendant. The counsel for the State then pointed to the defendant and asked the witness if he was not the man Johnson, and the witness answered that he was. Mrs. Walker, then Mrs. Brown, he stated, lost a clay bank horse some time during the month of August, 1876. The next day after the horse was taken the witness went to where, on the night before, he was staked in the field, and tracked him out at the back of the field, up to Mrs. Bruce's house, and thence to the town of Palestine, in Anderson county, where the witness lost the track. A

part of one of the hoofs of the horse was so broken off that his foot made a very peculiar and a very easily followed track. The witness was of opinion that the defendant owned no horse at the time of the theft of Mrs. Brown's horse. He had, a short time before this, contracted with a party to do some clearing, for which he had been given a horse, but he failed to perform his part of the contract, and the party with whom he contracted took the animal back. The witness first saw the defendant in 1876, when he engaged to make a crop on Mrs. Brown's place. After that the witness saw the defendant occasionally until he disappeared in the same year, since when the witness had not seen him until on this trial. The woman that Parker is supposed and said to have taken off lived at Mrs. Bruce's.

Cross-examined by the defense, the witness said that he never saw the defendant in possession of the missing horse, and did not know that the defendant took that horse.

Wyatt Lane was the next witness sworn for the State. He testified that he lived in Houston county, Texas, in 1876, about three miles from the house of the prosecuting witness, Mrs. Walker, then Mrs. Brown. One night in the month of August of that year, 1876, while the witness and his wife were occupying a bed on the gallery of their house, some one on horseback passed the house. The witness recognized the horse as Brown's old saddle horse, and remarked to his wife: "Frank Brown is worse, and yonder is some one going for the doctor." Witness said nothing to the party riding the horse. No one was with the man on the horse. Witness did not recognize the man. The witness could not say what time of night it was, though guessing it was about twelve o'clock. He had been asleep and was awakened by the barking of his dog. The road was about fifteen steps from the gallery where the witness and his wife were lying. The defendant is the man who worked at Mrs. Brown's in 1876. The witness only knew him by sight, and saw him only occasionally.

Cross-examined by the defense, the witness stated that he never saw the defendant in possession of the horse, and did not know of his own knowledge who took the animal.

F. H. Bayne was the next witness introduced on behalf of the State. He testified that he was the sheriff of Houston county, Texas. The State's counsel asked the witness if he had ever had a capias for the arrest of the defendant, and whether or not he had ever made search for the defendant and failed to find him,

and directed the witness to state when and where and under what circumstances the defendant was arrested. To these questions the counsel for the defense interposed strenuous objection, which being overruled, the witness stated in reply that a capias for the arrest of the defendant was placed in his hands, and as sheriff he made diligent search for the defendant and failed to find him in Houston county. He then transmitted the capias to the sheriff of Freestone county, who arrested the defendant and lodged him in the Houston county jail. The defendant was afterward released on bail, and in November, 1883, was re-arrested by the sheriff of Freestone county and re-lodged in the Houston county jail. The witness did not know that the defendant was avoiding arrest.

Mr. Childs was the next witness introduced and examined by the State. He testified that he was the sheriff of Freestone county, Texas. He knew the defendant. The defendant was first arrested in Navarro county. He was arrested the last time in Montague county. The defendant's father resided in Freestone county, and offered a reward of one hundred dollars for the re-arrest of defendant after he was released on bond on his first arrest. Defendant was a married man and had two children. Over the objection of the defense the witness was permitted to testify that he received a capias for the arrest of the defendant from Houston county, but failed, after search, to find him in Freestone county.

The State then introduced in evidence the judgment *nisi* of September, 1883, forfeiting the defendant's appearance bond. The State closed.

Colonel John B. Payne was the first witness for the defense. He testified that he resided in Navarro county, Texas, in 1876. He knew the defendant's father, who lived some eight or nine miles distant from the witness's house. He also knew the defendant, and had known him for many years. It had long been the custom of the witness to hire the hands he worked about the last of January or first of February of each year, and to employ them for five or six months. The witness was afflicted with a bad and uncertain memory, and could not say positively, but believed that it was in the year 1876 that he had had the defendant employed. He employed him in January or February, and he stayed with witness until the following July. The defendant's reputation for honesty was good in the community in which he was reared.

A. M. Carter was the next witness introduced and sworn for the defense. He testified that he lived in Freestone county, and lived there in 1876. He knew the defendant's father, from whom he lived about eight miles distant. He had known the defendant pretty much all of his life, say about twenty-five years. About the last of July or the first of August, either in 1875 or 1876 (the latter year, the witness believed), he hired the defendant to help him run a thresher, and from that time until the last of August the defendant worked at the thresher for him. The witness ran a thresher but one season, and that was the same year that J. A. Bounds purchased a thresher and commenced operating it, and that year was either the year 1875 or the year 1876, which the witness could not now be certain, but he was of impression that it was the latter year. At all events he had run a thresher but one year since the war, and that was the year that Bounds purchased his, and the same year that defendant worked for him. Witness met the defendant in the town of Wortham, Freestone county, Texas, in the month of July before the August in which the defendant entered his service. The defendant's character for honesty up to the time this charge was preferred against him was perfectly good. Witness had never heard his honesty impeached before.

J. A. Bounds was the defendant's next witness. He testified that he lived in Freestone county, and lived in that county during the year 1876. Witness purchased a thresher in 1876, and ran it that year and for several succeeding years. The witness at that time lived about thirteen miles distant from the house of the previous witness, Carter. Carter operated a thresher the same year that witness purchased and commenced the operation of his, which was the year 1876. Witness remembers this, because he started to make a drive in Carter's neighborhood, when he found that Carter had purchased and was operating a thresher. He then turned his thresher into another course. The witness did not know that Carter ever run his thresher before this year, but was of impression that he, Carter, run it after 1876. Such, at least, was the understanding of the witness. The witness had known the defendant for some fifteen or sixteen years. Until the defendant was charged with the theft of the horse in this case, his reputation for honesty was as good as that of any person known to the witness.

Mrs. Johnson, the mother of the defendant, testified, in his behalf, that she still lived in Freestone county, on the same place

she lived in 1876. The witness did not know of her own knowledge where the defendant worked or stayed all of the time during the year 1876, but was under the impression that he worked for Colonel John B. Payne. He and Colonel Payne's son frequently came to the witness's house together during the summer of 1876. Some time during that year the defendant helped Mr. Carter run a threshing machine. About the last of August or first of September of that year, the defendant left the witness's house to go out west. It was the recollection of the witness that the defendant worked at Mr. Longbotham's during the year 1875. In May, June and July, 1877, he worked on the witness's place. He married in the fall of 1877. The witness had never heard of the defendant being or living in Houston county, until he was arrested under the charge on which he is now tried.

Jasper Steadman was the last witness examined in the case. He testified, on behalf of the defendant, that he had known the defendant for twelve years, and knew that his reputation for honesty, until arrested on this charge, was perfectly good. The witness lived in Freestone county. About the last of August or first of September, 1876, the witness met the defendant in Navarro county, Texas, about twenty miles from defendant's father's house, going out west. He had no horse, and was traveling on foot.

The motion for new trial called in question the sufficiency of the evidence to support the conviction, the action of the court in admitting the testimony of the sheriffs of Houston and Freestone counties regarding the issuance of *capias* for the arrest of the defendant, and his arrest, and the correctness of certain paragraphs of the charge. The motion was overruled.

*Maxcy & Maxcy* and *Cooper & Cooper*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This prosecution was commenced by indictment presented and filed November 25, 1876, and the charge preferred in said indictment was "that Anderson N. Johnson, on the twenty-first day of August, 1876, in the county of Houston aforesaid, *one gelding* of the value of seventy-five dollars, the corporeal personal property then and there of Amanda Brown, fraudulently and feloniously did take, steal and carry away," etc. At the time this offense was alleged to

have been committed, theft of *a gelding,* as distinguished from theft of *a horse,* was a specific offense, made so by the statute of 1858, which provided that, "If any person shall steal any horse, gelding, mare, colt, ass, or mule, he shall be punished," etc. (Pas. Dig., Art. 2409.)

Construing this statute, our Supreme Court, in *Banks* v. *The State,* 28 Texas, 644, say: "The word 'horse,' in the Article cited, was not intended to be used in its comprehensive and generic sense, and it was used as synonymous with the word 'stallion,' or, at least, it was not in that connection intended to include 'gelding, mare or colt.' It is our duty to give to the Article such construction as will give effect and meaning to each word, as nearly as can be consistently done with the object and purpose of the Legislature. The statute itself, in creating and providing for the punishment of the offense, appears to fix its own meaning to the words used. It specifically describes the different species of property by the use of the words 'horse, gelding, mare, colt, ass, or mule,' evidently discriminating between them as different species of property, and as much between horse and mare as between horse, ass, or mule. The averments of the indictment must be equally specific, *and the proof must correspond with the averment."* Many subsequent decisions to the same effect have since been made. (*Keese* v. *The State,* 1 Texas Ct. App., 298; *Lunsford* v. *The State,* Id., 448; *Parsons* v. *The State,* 3 Texas Ct. App., 240; *Brisco* v. *The State,* 4 Texas Ct. App., 219, and authorities cited.)

Under Article 746 of our Code, adopted as part of our Revised Statutes in 1879, the generic word "horse" is used as embracing all the horse species as distinguished from "ass or mule," and this is the statute now in force. It repealed the previous statute, it is true, so far as the distinction between the different members of the horse family had theretofore existed; but by express provision of the "Final Title" to the Revised Statutes, a rule was prescribed for pending cases both civil and criminal, to the effect "that no offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred prior to the ti--
when any statute, or part thereof, shall be rep-- '
by the Revised Statutes, shall be discharged,
repeal or alteration; but prosecutions and sui
liabilities, penalties or forfeitures shall be inst\                    .ed-
ed with in all respects as if such prior statute, (                  .of, had
not been repealed or altered, except that wher\                 .ode of pro

cedure or matters of practice have been changed by the Revised Statutes, the procedure had, after the Revised Statutes shall have taken effect, in such prosecution or suit shall be as far as practicable in accordance with the Revised Statutes."

In the case before us the charge in the indictment being "theft of a gelding," and that being a descriptive allegation of a specific offense under the law at the time in force, the proof should have corresponded with the allegation, and being descriptive of the identity of the offense, the prosecution was bound to sustain it by the proofs. This was not done. Nowhere in the proofs do we find any evidence that "the horse" proven to have been stolen was "a gelding."

This identical question was decided by this court in *Velasco v. The State*, 9 Texas Court of Appeals, 76, in which it was held that to apply the new provision, Article 746 of the Revised Penal Code, in a trial for horse theft committed before the Revised Codes took effect, would be *ex post facto* (citing *Calloway* v. *The State*, 7 Texas Ct. App., 585), and that ·a variance between the allegation and the proof is fatal to the conviction, notwithstanding that the trial was had since the Revised Codes took effect. On the ground of variance thus manifest, the judgment must be reversed.

On the sufficiency of the evidence, in addition to the fact that defendant raised a serious question as to his personal identity, it is made to appear that on the night the horse was stolen one "Mr. Parker stole defendant's wife," or the wife of the man defendant was supposed to be. And whilst defendant disappeared himself that night, and his saddle bags and saddle also disappeared, it is not improbable, and not altogether unreasonable in the absence of proof, that Mr. Parker wanted a horse to carry the woman off on, and, being so wholly regardless of defendant's domestic rights, he might have concluded further not to respect his property rights in the saddle and saddle bags, which articles he could perhaps utilize to advantage with the horse in his purposes and intent to rob the man of his wife.

We would not do intentional injustice to Mr. Parker, but these suggestions are thrown out because the disappearance of the saddle and saddle bags on the night the horse and woman were stolen are the principal inculpatory facts in the record against defendant, and whilst they may be pertinent and strong circumstances if his identity be established, they do not of them-

selves exclude every other reasonable hypothesis but that of his guilt, as we have endeavored to show.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 11, 1884.